EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS MARTÍNEZ BRITO, acusado y apelante.

*Número:* CR-70-9   *Resuelto:* 17 de diciembre de 1970

---

494

*Jorge A. Vera Vélez,* abogado del apelante; *Gilberto Gierbolini, Procurador General,* y *Adolfo Negrón Cruz, Procurador General Auxiliar,* abogados de El Pueblo.

PER CURIAM: El apelante Luis Martínez Brito, fue acusado y convicto de seis infracciones al Art. 29 de la Ley de Narcóticos (24 L.P.R.A. sec. 974z), consistente de dos cargos de venta, dos de ocultar y transportar y dos de posesión y dominio de, marihuana. Su arresto se efectuó mediante una redada en la cual fueron arrestadas 26 personas. Fue condenado a la pena de 7 a 15 años de presidio en cada cargo, a cumplirse concurrentemente.

Apunta en apelación que el tribunal sentenciador incidió (1) al denegar la moción de nuevo juicio presentada al enterarse el apelante, después del veredicto, de las influencias extrañas ejercidas sobre el jurado por un miembro del panel juzgador; (2) al no ordenar la posposición del juicio por ser necesaria la comparecencia de un confidente participante y al no ordenar al ministerio público que agotara los esfuerzos posibles para lograr su verdadera identidad y dirección; (3) al negarse a posponer la vista del caso debido a que la redada había tenido un gran destaque en los medios de comunicación y que en tales circunstancias el acusado no estaría ante un jurado imparcial y no tendría las garantías de un juicio justo e imparcial; y (4) al instruir al jurado que la prueba de coartada "no puede dejar de demostrar claramente que el acusado no se encontraba en el sitio en que ocurrieron los hechos y sí se encontraba en un lugar distinto."

Por los fundamentos relacionados a continuación concluimos que no tiene razón.

El Procurador General resume los hechos del caso relacionados con los referidos apuntamientos correctamente así:

"Una vez señalado el caso para juicio se solicitó su suspensión basada dicha petición en que la prensa del país le dio destaque prominente y un columnista del periódico 'El Mundo' había señalado que el alcalde de Manatí le había servido de fiador a los arrestados. Además, se adujo en otra moción de posposición la necesidad de conseguir el nombre y dirección de un testigo de la prueba del pueblo en la vista preliminar quien identificó al apelante ante el agente encubierto como una persona que se dedicaba al tráfico de narcóticos. Se indicó que dicho testigo sería esencial de surgir la posible defensa de entrampamiento ('entrapment'). Estas mociones fueron declaradas sin lugar por el tribunal a quo y se procedió a la vista de los casos en su fondo.

Los hechos que dieron lugar al arresto y procesamiento del apelante ocurrieron en Manatí durante los días 8 y 18 de octubre de 1965. (T.E. págs. 67 a 78, I parte.) La transacción del día

8 de octubre se realizó en la Calle Francisco Alvarez de Manatí en los billares de Tibidabo y La Nueva Barita a las 4:30 de la tarde. Al llegar el agente encubierto, Pedro Maldonado Olivo, al lugar de los hechos el acusado le dijo 'me quedan' refiriéndose a que le quedaban cigarrillos de marihuana y le vendió tres por dos dólares. (T.E. pág. 67, I parte). La transacción de 18 de octubre se efectuó en el negocio conocido por El Cialeño y Yardito's Place alrededor de las 5:30 de la tarde en la Calle Eugenio Sánchez López de Manatí. El agente le preguntó al apelante si había visto a Lonchito Román y Aulet Seda y éste le contestó que no. A continuación le preguntó si quería 'yerba' refiriéndose a la marihuana. Le vendió tres cigarrillos por dos dólares. Fue a buscar los cigarrillos en dirección a su residencia dos o tres casas más adelante, habiendo regresado como a los tres minutos. El agente había conocido al apelante en otra transacción realizada el 5 de octubre, en la cual aquél había sido identificado por el confidente Raymond Manhattan. (T.E. pág. 64, I parte.) El arresto se efectuó el 26 de febrero de 1966. Señalado el juicio para el 12 de mayo de 1966 el apelante solicitó sin éxito la suspensión del mismo por las razones ya aducidas. Al celebrarse el juicio, a pesar de que la defensa de coartada no había sido anunciada, Regla 74 de las de Procedimiento Criminal, el tribunal permitió al apelante presentar prueba de coartada para demostrar que el 8 de octubre de 1965 se encontraba en el Doctor's Center desde las dos de la tarde hasta las diez de la noche atendiendo a su esposa que había dado a luz mediante operación de cesárea el día 6 de octubre y que el día 18 del mismo mes él había estado trabajando para el contratista de construcciones Jorge Luis Franco en la residencia de 'Miss Ramos Orengo', desde las siete de la mañana hasta las seis y cuarto de la tarde. (T.E. págs. 207 y siguientes y 191 y siguientes II parte.)

Una vez convicto y sentenciado el apelante radicó moción de nuevo juicio basando la misma en alegada información que alegó ser cierta de que en el veredicto del jurado hubo influencias extrañas a la sala de justicia. Se indicó por la representación legal del apelante que un miembro del jurado había realizado investigaciones por su propia cuenta y sin autorización del tribunal antes de rendirse veredicto. El tribunal declaró sin lugar dicha moción."

El primer apuntamiento se basa en una declaración jurada de uno de los abogados del apelante al efecto de que la señora Inés Ramos Ortega le informó que uno de los jurados del caso, Ramón Rodríguez Espino, la había visitado mientras se estaba ventilando el caso y le había preguntado si el apelante había trabajado en la casa de ella y si los padres de aquél le habían visitado ese mismo día; que intentó continuar interrogándola sobre el tema y ella evadió el tema, y que dicha señora se negó "rotundamente" a dar una declaración jurada sobre el particular. En su moción de reconsideración de 28 de julio de 1966 alegó el apelante ante el tribunal de instancia que al comparecer el día ocho de dicho mes y año al acto de lectura de sentencia en estos casos el apelante le informó al tribunal de instancia de los anteriores particulares y a base de los mismos volvió a solicitar un nuevo juicio pero el tribunal de instancia denegó dicha moción.

La prueba de coartada consistió en parte, en el testimonio del contratista Franco y del apelante al efecto que el día 18 de octubre de 1965, fecha en que, según una de las acusaciones, el apelante tenía en su poder, ocultó y transportó y vendió marihuana en Manatí, el apelante estaba trabajando para dicho contratista en calidad de plomero en la residencia de la señora Ramos Ortega en la Urbanización San Salvador de Manatí.

Sostiene el apelante, en síntesis, que el tribunal de instancia abusó de su discreción al no ordenar una investigación de las referidas actuaciones del mencionado miembro del jurado y al no entrar a considerar en sus méritos la moción de nuevo juicio del apelante para determinar si influencias extrañas fueron o no perjudiciales a los derechos de un acusado.

La Regla 188 de las de Procedimiento Criminal que rige la concesión discrecional de nuevo juicio dispone que se concederá cuando el jurado recibió evidencia fuera de sesión,

excepto la que resulte de una inspección ocular, y como consecuencia se perjudicaron derechos sustanciales del acusado.

En vista de que de la declaración jurada no aparece que la señora Ramos Ortega suministrase al jurado Rodríguez la información que éste le solicitó con respecto a si el apelante había trabajado en su casa, resulta obvio que la gestión de dicho jurado, impropia que fue, no pudo causar perjuicio alguno al apelante.

Las circunstancias de los casos de *Remmer* v. *United States*, 347 U.S. 227 (1954), y *Rubenstein* v. *United States*, 227 F.2d 638, 643 (10th Cir. 1955), en el que descansa el apelante son distintas al del que nos ocupa. En *Remmer*, supra, el peticionario se enteró después del veredicto que alguien le había comunicado a la persona que fue electa presidente del jurado que podría beneficiarse si rendía un veredicto favorable al peticionario, lo que fue informado por dicha persona al juez y por éste a los fiscales. Como resultado de esto se ordenó al Negociado Federal de Investigaciones (FBI) que investigase el asunto y rindiese un informe. Dicho informe fue considerado por el juez y los fiscales solamente, los que concluyeron, que la referida comunicación se hizo en forma de chiste. Alegados estos hechos en moción de nuevo juicio, la misma fue denegada sin vista. El tribunal concluyó que esta actuación del tribunal de instancia fue errónea y devolvió el caso para que se celebrara una vista con el fin de determinar si el incidente fue perjudicial al peticionario. Dijo el Tribunal Supremo Nacional en este caso que "En un caso criminal, cualquier comunicación, contacto o intervención particular, directa o indirectamente, con un miembro del jurado durante el juicio con respecto a la cuestión pendiente ante el jurado, por razones obvias es consideración presumiblemente perjudicial, si no se efectúa de acuerdo con las reglas conocidas del tribunal y las instrucciones y directrices dictadas por el tribunal durante el juicio y con pleno conocimiento de las partes. Esta presunción no es conclu-

yente pero el peso descansa pesadamente sobre el gobierno de establecer, luego de notificar al demandado y de ser éste oído, que tal contacto con un miembro del jurado no fue perjudicial al demandado." En este caso se estableció que hubo una oferta a un miembro del jurado para inducirlo a que se lograse un veredicto no imparcial y que hubo una investigación la que "podía impresionar al miembro del jurado más de la cuenta"; que "Un miembro del jurado debe sentirse libre para ejercer su función sin que el FBI u otra persona lo esté observando por encima del hombro"; que "El tribunal de instancia no debe decidir y tomar acción final ex parte sobre una información como la que se recibió en este caso pero debió determinar a través de una vista, en la que participaran todas las partes interesadas, el impacto de tal circunstancia sobre el miembro del jurado y si fue no perjudicial."

En *Rubenstein*, supra, las circunstancias son también distintas pues aquí los miembros de un panel, que resultaron luego formar parte del jurado en este caso fueron entrevistados, interrogados y examinados con el fin de determinar si se habían cometido unos delitos por personas que trataron de interferir con la debida administración de la justicia en otros casos en el mismo tribunal. Por lo tanto, había que determinar si tal contacto pudo afectar el estado de ánimo de miembros timoratos del panel o de aquellos de temperamento sensitivo al extremo de que no pudieran ejercer su juicio con la misma imparcialidad que lo hubieran hecho en asuencia del contacto. A esos efectos había que darle al peticionario, mediante una vista, la oportunidad de probar si en realidad tales contactos pudieron provocar una reacción en los jurados de este caso perjudicial al peticionario.

En el caso ante nos, el contacto con el miembro del jurado no fue gestionado por un extraño y sí por el propio miembro del jurado. La señora a quien se dirigió el miembro del jurado en cuestión informó que sólo le preguntó si el ape-

lante había trabajado en su casa. No se indicó día preciso cuando lo hizo. Dicha señora informó que "el jurado Ramón Rodríguez Espino intentó continuar interrogándola sobre el tema pero que ella hábilmente evadió el asunto." También se declaró bajo juramento que dicha señora se negó rotundamente a declarar sobre la visita que le hizo el mencionado jurado y sobre la conversación que tuvo con ella.

■ No aparece de las alegaciones de la moción de nuevo juicio, ni de la declaración jurada, si la señora Ramos Ortega suministró información alguna a Rodríguez Espino. Por el contrario, la declaración jurada informa que ella *evadió el tema* de si el apelante realizó o no algún trabajo en su casa. No se precisó época o fecha alguna en que tal trabajo pudo haberse realizado. En estas condiciones no se ha ofrecido prueba o indicio alguno de información solicitada por y transmitida al miembro del jurado en cuestión que en forma alguna fuese perjudicial al apelante.

2.—Se arguye que el tribunal de instancia incidió al no ordenar la posposición de la vista del caso basada en la petición de la defensa de que era necesaria la comparecencia de un confidente participante.

Al terminar de pasar la prueba de cargo, el abogado de la defensa solicitó del tribunal de instancia que se le diera información por parte del ministerio público, con relación a Raymond Manhattan, su dirección, el nombre correcto de Raymond Manhattan, y el sitio en que lo podían localizar a los fines de determinar, si lo iban a utilizar como testigo de defensa, ya que otro testigo declaró que en la transacción del 5 de octubre de 1965 estuvo presente la persona ésta conocida por Raymond Manhattan, que participó; que era "ésta una persona que estuvo presente, un testigo presencial, y que en la jurisprudencia americana se llama 'the silent witness', o sea, el testigo que todo el mundo lo menciona en Corte, pero nadie conoce."

■ El fiscal informó que no la tenía pues estaban buscando al tal Manhattan por estar acusado de un caso de droga y no lo habían podido conseguir; que esa persona no era un confidente participante ni tampoco un confidente. El récord demuestra que el agente de rentas internas Pedro Maldonado Olivo testificó que cuando en 5 de octubre de 1965 habló por primera vez con el apelante "tuve la ocasión de ir con un sujeto conocido por Raymond Manhattan." Luego repitió que conoció al apelante por primera vez en 5 de octubre de 1965 cuando "En unión a Raymond Manhattan tuve oportunidad de hablar con el acusado en una calle que da al Teatro Taboas en Manatí." Las transacciones delictivas que dieron lugar al procedimiento del apelante se realizaron en el 8 y el 18 de octubre de 1965, en las cuales no aparece de la prueba que estuvo presente ni participó Raymond Manhattan. Por lo tanto, no podemos convenir con el apelante de que Manhattan fue un confidente participante cuya identidad hubo que divulgar. *Pueblo* v. *López Rivera*, 91 D.P.R. 693 (1965).

■ 3.—No incidió el tribunal de instancia al negarse a posponer la vista del caso debido a que la redada en que fue arrestado el apelante "hubiera tenido un gran destaque en los medios de comunicación local y que por tales circunstancias el acusado no estaría ante un jurado imparcial."

En apoyo de la posposición por razón de publicidad ofreció en evidencia el apelante la publicación del periódico "El Mundo" de 25 de febrero de 1966.

No hubo prueba de que dicha publicidad fue de la magnitud, de la penetración intensa y de la adversa influencia decisiva, que convirtió el juicio en un circo en *Sheppard* v. *Maxwell*, 384 U.S. 333 (1966), o que se consideró objetable en *Rideau* v. *Louisiana*, 373 U.S. 723 (1963), o en *Estes* v. *Texas*, 381 U.S. 532, 565 (1964). Por el contrario, como informa el Procurador General, correctamente a nuestro

juicio, "En la fotografía en que aparece el acusado tapándose la cara lo identificaron con otro nombre. El interrogatorio a que fueron sometidos los jurados dejó claramente establecido que ellos no tenían opinión formada sobre los hechos del caso y que estaban dispuestos a juzgar al acusado a base de la prueba que se presentara en el juicio. El jurado Luis Zeno expresó no estar enterado de los hechos a través de la prensa, radio y televisión. Reynaldo Domínguez Martínez, quien declaró haber discutido el caso con 20 ó 30 personas en Barceloneta, a base de los informes de prensa, radio y televisión, fue recusado perentoriamente por el fiscal. Ramón Rodríguez Espino, vecino del acusado y quien declaró haberse enterado de los informes de prensa relacionados con el caso, expresó que juzgaría el caso con absoluta imparcialidad. Ángel M. Román no había leído sobre las noticias del caso ni conocía al acusado, pero fue recusado perentoriamente por la defensa al expresar presunción de culpabilidad hacia el acusado. Otros jurados indicaron no haber tenido noticias sobre el caso."

4.—Con respecto a la prueba de coartada la instrucción al jurado del juez sentenciador fue la siguiente:

"Pues bien, por su parte el acusado les dice a ustedes 'yo el día ese a que se refiere este señor, el 8 y 18 de octubre, yo no estaba en el sitio en que se dice alega que yo tenía, transporté y vendí esos cigarrillos'. Que el día 8 de octubre él estuvo en la clínica 'con mi esposa', y él declaró que estuvo desde las tres de la tarde hasta las diez y media de la noche. Que el día 18 estuvo trabajando con un señor en una obra que estaba haciendo, una obra en la Urbanización Santa Bárbara, de donde salió alrededor de las seis de la tarde.

Esto es lo que se llama la prueba de coartada o alibi. Fíjense ustedes que es una cuestión de hecho, únicamente de hecho, que le corresponde a ustedes determinar. O creen ustedes la prueba del fiscal, o creen ustedes la prueba del acusado.

En términos generales, según el derecho, o coartada o alibi es la defensa que se establece para demostrar que la persona a quien se le acusa se encontraba en un sitio distinto a aquél

en que se cometió el delito, a un tiempo en que no ha podido estar en el sitio del suceso en el mismo momento en que dicho delito se cometió.

Si la prueba presentada para establecer una coartada deja de demostrar claramente que el acusado se encontraba en el sitio que alega precisamente en el mismo momento de la ocurrencia de los hechos o que él no podía encontrarse en el lugar del delito al tiempo de cometerse éste, la coartada ha dejado de establecerse. En otras palabras, si el acusado ha podido estar en el sitio en que él alega se encontraba y sin embargo ha podido también estar en el lugar del delito en el momento en que éste se cometió, no existe la coartada.

Sin embargo, debo instruirles que el acusado no tiene que probar la coartada fuera de duda razonable. Si establece con su prueba una duda razonable o fundada, debe absolvérsele. Exigirle la prueba fuera de toda duda razonable sería exigirle una prueba de inocencia. Si el acusado logra con su prueba establecer una prueba, digo, una coartada en cuanto a la prueba presentada por el fiscal, esa duda es en beneficio del acusado y debe absolvérsele."

■ Se alega que esta instrucción es errónea, en síntesis, porque "Para las mentes del jurado y para la mayoría de la gente el significado de claramente es: que no existe duda, *que es definitivo, sin sombra alguna de duda que no cabe creer otra cosa*. Siendo esta la connotación que al término *claramente* se les da por la generalidad de las personas, entendemos que el juez en sus instrucciones al jurado indicó a éstos que el acusado apelante tenía que traer prueba sobre coartada que no tuviera la leve sombra de duda."

En apoyo de este apuntamiento invoca la doctrina que establecimos en *Pueblo* v. *Moreu Pérez*, 96 D.P.R. 60 (1968). Pero es que en este caso lo que resolvimos es que constituye un error perjudicial una instrucción en el sentido de que si los jurados están convencidos de que la prueba de coartada es falsa o que fue fabricada, pueden considerarla como una admisión de culpabilidad.

No creemos que la primera oración del párrafo cuarto

de dicha instrucción tiene el alcance que el apelante pretende darle. Su verdadero alcance lo define la segunda oración de dicho párrafo al decir "En otras palabras", que el acusado ha podido estar en el sitio que alega se encontraba y sin embargo ha podido estar también en el lugar del delito en el momento que éste se cometió.

Aunque el término *claramente* en esta instrucción no es afortunado, no es impropio al extremo de haber causado un perjuicio sustancial a los derechos del apelante pues se explicó inmediatamente en el sentido de que el acusado ha podido estar en un lugar el día de los hechos y estar en el lugar del delito en el preciso momento en que se cometió. El propósito de la aclaración fue simplemente llamar la atención del jurado a una realidad a los efectos de estar en mejores condiciones de apreciar el alcance y peso de la prueba de coartada. De todos modos en el párrafo siguiente de la instrucción se hizo bien claro, con apropiado énfasis, que la prueba de coartada sólo tiene que establecer una duda razonable pues exigir prueba fuera de toda duda razonable sería exigir prueba de la inocencia del acusado.

En vista de lo expuesto, *se confirmarán las sentencias dictadas en estos casos, por el Tribunal Superior, Sala de Arecibo, en 8 de julio de 1966.*

El Juez Presidente, Señor Negrón Fernández, al igual que el Juez Asociado Señor Santana Becerra, no intervino.